# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
FILED

SEP 2 1 2000

MICHAEL N. MILBY, CLERK

| | | |
|---|---|---|
| *DENNIS R. WALKER,* | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. CA-C-00-099** |
| | § | |
| *SUSAN LAMB, ET AL.,* | § | |
| **Defendants.** | § | |

## DEFENDANT LAMB'S
## MOTION FOR SUMMARY JUDGMENT

### TO THE HONORABLE JUDGE OF THE DISTRICT COURT:

Defendant Susan Lamb (Lamb), by and through the Attorney General for the State of Texas, submits this Motion for Summary Judgment. In support thereof, Lamb respectfully offers the following:

## I.

## STATEMENT OF THE CASE

Plaintiff Dennis Walker is an inmate incarcerated in the Texas Department of Criminal Justice, Institutional Division (TDCJ-ID). He filed this lawsuit *pro se* and *in forma pauperis,* alleging a violation of his right to due process under 42 U.S.C. § 1983. Specifically, Walker contends that he gave the Garza West Unit Mailroom in Beeville Texas, two letters to be mailed to the Texas Department of Criminal Justice's Internal Affairs Division. These letters were to be sent by certified mail, return receipt requested. Walker received the green cards back from both letters, however, neither letter had a signature showing that the recipients received their mail. Walker now claims that TDCJ mail personnel destroyed or intercepted his letters instead of mailing them. He is suing Lamb because she was the supervisor over the Garza West mailroom at all times.

13.

Lamb asserts that she is entitled to summary judgment because there is no evidence that the letters Walker gave to the mailroom on March 7, 1998, and April 9, 1998, were ever destroyed or intercepted. She also asserts that she had no personal involvement in the allegations which form the basis of Walker's lawsuit, an element Walker must prove in order to establish a § 1983 claim. Additionally, Lamb asserts the defense of *respondeat superior,* that she cannot be held vicariously liable for the actions of her subordinates.

## II.

### MOTION FOR SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P. 56(b), Lamb moves this Court to grant summary judgment in her favor because there is no genuine issue as to any material fact. In support thereof, Lamb attaches the following:

**Exhibit A**:   Deposition of Dennis Walker dated September 13, 2000.

**Exhibit B**:   Affidavit from Garza West Mailroom Supervisor Lillie Harris.

### III.

### UNDISPUTED FACTS

1.   Walker is an inmate of the Texas Department of Criminal Justice, Institutional Division, and is currently housed at the Dalhart Unit in Dalhart, Texas.

2.   Walker was housed at the Garza West Unit in Beeville, Texas, during the time period he alleges that two pieces of certified mail were returned to him unsigned.

3.   Lamb was employed by the Texas Department of Criminal Justice, Institutional Division, as a Mailroom Supervisor at all relevant times.

## IV.

### ISSUES OF LAW

1.  Walker claims that his due process rights were violated when two letters he submitted to the Garza West Mailroom were allegedly destroyed or intercepted by TDCJ employees. Is Lamb entitled to summary judgment when Walker has no evidence that his letters were destroyed or intercepted by her?

2.  Personal involvement in a constitutional deprivation is an essential element of a civil rights cause of action. If Lamb had no personal involvement in the alleged destruction or interception of Walker's letters, is Lamb entitled to summary judgment on Walker's 42 U.S.C. § 1983 claim?

3.  Supervisory officials cannot be held vicariously liable for a subordinates' actions. Is Lamb, who was the mailroom supervisor at all times relevant, entitled to summary judgment because she cannot be held liable for the actions of the employees she supervised?

## V.

### SUMMARY JUDGMENT STANDARD

Rule 56(c) provides that summary judgment shall be rendered if there is no "genuine issue as to any material fact and ... the moving party is entitled to summary judgment as a matter of law." Federal Rule of Civil Procedure 56(c), by its very terms, permits summary judgment even if the parties disagree as to some facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 2510 (1986). Summary judgment is precluded only if the disputed facts "might affect the outcome of the suit under governing law" and if the dispute is genuine. *Id.* A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non moving party." *Id.* The district court should grant summary judgment when it appears that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir. 1988).

To be entitled to summary judgment as a matter of law, a defendant need not refute the plaintiff's claims, but need only show "there is an absence of evidence to support the non moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S. Ct. 2548, 2554 (1986); *accord Slaughter v. Allstate Ins.. Co.*, 803 F.2d 857 (5th Cir. 1986). Thus, the defendant is entitled to summary judgment when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to the plaintiff's case, and on which [the plaintiff], will bear the burden of proof at trial." *Celotex,* 106 S. Ct. at 2553; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (the burden is not on the moving party to produce evidence showing the absence of genuine issue of material fact); *see also Intercontinental Ass'n of Machinists and Aerospace Workers No. 2504 v. Intercontinental Mfg. Co.,* 812 F.2d 219, 222 (5th Cir. 1987).

In the case at bar, Walker has failed to allege sufficient facts to meet his burden of proof. Consequently, Lamb is entitled to judgment as a matter of law.

## VI.

### PLAINTIFF'S CLAIMS UNDER § 1983

**A.    No evidence that Lamb destroyed or intercepted Walker's letters in violation of his right to due process.**

Walker claims that he submitted letters to the Garza West Mailroom on March 7, 1998, and April 9, 1998, to be sent by certified mail, return receipt requested. Ex. A at pp.10, 32-33. He admits that it is his responsibility to pay for and prepare the proper documentation for sending letters by certified mail. Ex. A at pp. 20-21. Walker also admits that he received receipts for certified mail which were date stamped March 7, 1998, and April 9, 1998. Ex. A at pp. 11, 32-3. After an inmate gives a letter to the Garza West Prison Mailroom, information regarding the letter is documented in

a mailroom log and the certified letter, green card, and receipt of certified mail is taken to the U. S. Post Office located in Beeville, Texas, to be mailed. Ex. B. A Receipt for Certified Mail is date stamped by a U. S. Postal employee not an employee of the Garza West Unit. Ex. B. After the letter is received by the U. S. Post Office, TDCJ employees do not have any further control over the letter. Ex. B.

Both Walker's letters dated March 7, 1998, and April 9, 1998, were given to the U. S. Post Office, as indicated by the date stamped mark on the receipt for certified mail. Ex. A at Ex. 1 and 4. Because the U. S. Post Office received the letters, their alleged destruction or interception after they were delivered to the U.S. Post Office would not subject Lamb to liability for any constitutional violations as alleged by Walker. Therefore, summary judgment should be granted in Lamb's favor.

**B.      No evidence of any personal involvement by Defendant Lamb.**

There is no evidence that Lamb participated in, witnessed, or had knowledge of the allegations underlying Walker's § 1983 claim. Walker claims that Lamb, because she was the mailroom supervisor at the Garza West Unit, is responsible for a violation of his right to due process because two pieces of mail, which he sent certified, were allegedly destroyed or intercepted. Ex. A at pp. 11-14, 49. He also contends that these two letters were read by mailroom personnel.

Personal involvement in the alleged constitutional deprivation is an essential element of a civil rights cause of action. *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). 42 U.S.C. § 1983, under which Walker brings this cause of action, provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Stated more concisely, the person to be held liable for a constitutional deprivation must have either directly or indirectly subjected some other person to a constitutional deprivation while acting under color of state law.  There is no evidence that Lamb either directly or indirectly deprived Walker of any Constitutional right.  Therefore, Lamb is entitled to judgment as a matter of law regarding Plaintiff's § 1983 claim.

## C.      *Respondeat Superior.*

Additionally, Walker claims that Lamb is responsible for the conduct of the mailroom staff who were under her supervision at the Garza West Unit.  Ex. A at pp. 13-14, 49.  However, "[w]ell settled § 1983 jurisprudence establishes that supervisory officials cannot be held vicariously liable for a subordinates' actions." *Mouille v. City of Live Oak, Texas*, 977 F.2d 924, 929 (5th Cir.), cert. denied 113 S. Ct. 2443 (1992).  Instead, "[s]upervisory officials may only be held liable if:  (i) they affirmatively participate in acts that cause constitutional deprivation; or (ii) implement unconstitutional policies that causally result in plaintiff's injury." *Id.*

As stated above, liability may not be established regarding the first prong of *Mouville* because Lamb was not personally involved in the alleged constitutional violation.  Liability may be established under the second prong of *Mouille* when "supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987).  However, there is no evidence that Lamb implemented any policy which would have violated Walker's right to due process.  Accordingly, summary judgment should be granted in favor of Lamb.

# VIII.

## CONCLUSION

Walker has not alleged facts sufficient to support a claim of constitutional deprivation. Lamb has produced evidence showing that no genuine issue of material fact exists in this case, and that Walker's claims do not rise to the level of a constitutional violation. The undisputed facts and competent summary judgment evidence indicate that Lamb did not violate Plaintiff's constitutional right of due process. Accordingly, Lamb prays that summary judgment be granted in her favor as to all of Walker's claims and that this Court grant any and further relief as this Court deems just and appropriate.

Respectfully submitted,

JOHN CORNYN
Attorney General of Texas

ANDY TAYLOR
First Assistant Attorney General

MICHAEL T. MCCAUL
Deputy Attorney General for Criminal Justice

PHILLIP E. MARRUS
Assistant Attorney General
Chief, Law Enforcement Defense Division

JENNETTE E. DEPONTE
Assistant Attorney General
Attorney-In-Charge
State Bar No. 00795935
Southern District #: 23305

P. O. Box 12548, Capitol Station
Austin, Texas 78711
Phone No. (512) 463-2080
Fax No.    (512) 495-9139

**ATTORNEYS FOR DEFENDANT
LAMB**

## CERTIFICATE OF SERVICE

I, JENNETTE E. DEPONTE, Assistant Attorney General of Texas, do hereby certify that

a true and correct copy of the forgoing **Defendant Lamb's Motion For Summary Judgment** has

been served by placing same in the United States Mail, Certified Mail, Return Receipt Requested,

postage prepaid, on this the 20th day of September, 2000, addressed to:

Dennis R. Walker, TDCJ-ID 655576          *CM/RRR  No. P 329 142 848*
Dalhart Unit
HCR 4 - Box 4000
Dalhart, Texas  79022
**Acting** *pro se*

JENNETTE E. DEPONTE
Assistant Attorney General

Jd2/Fed.Ct.Cases/southern/Walker v. Lamb/Walker.msj          8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| *DENNIS R. WALKER,* | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. CA-C-00-099 |
| | § | |
| *SUSAN LAMB, ET AL.,* | § | |
| Defendants. | § | |

# Exhibit A

# Derrick Webster's I-60 dated May 13, 1998

1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  CORPUS CHRISTI DIVISION

 3    DENNIS R. WALKER,            )
                                   )
 4            Plaintiff,           )
                                   )
 5    VS.                          )  CAUSE NO. 00-99
                                   )
 6    SUSAN LAMB,                  )
                                   )
 7            Defendant.           )

 8

 9


10       *******************************************

11                    ORAL DEPOSITION OF

12                    DENNIS R. WALKER

13                    SEPTEMBER 13, 2000

14       *******************************************

15

16       ORAL DEPOSITION of DENNIS R. WALKER, produced as a

17    witness at the instance of the Defendant, and duly

18    sworn, was taken in the above-styled and numbered cause

19    on the 13th of September, 2000, from 11:02 A.M. to 12:10

20    P.M., before Kary A. Wingo, CSR, RPR and Notary Public

21    in and for the State of Texas, reported by stenographic

22    method, at TDCJ-ID Dalhart Unit, HCR 4, Box 4000,

23    Dalhart, Texas, pursuant to the Federal Rules of Civil

24    Procedure and the provisions stated on the record or

25    attached hereto.
```

2

```
 1              A P P E A R A N C E S

 2


 3   FOR THE PLAINTIFF:  (PRO SE)
          MR. DENNIS R. WALKER
 4        TDCJ-ID #655576
          Dalhart Unit
 5        HCR 4, Box 4000
          Dalhart, Texas  79022
 6


 7   FOR THE DEFENDANT:
          MS. JENNETTE E. DePONTE
 8        Assistant Attorney General
          Law Enforcement Defense Division
 9        300 W. 15th Street, 7th Floor
          Austin, Texas  78701
10


11   ALSO PRESENT:
          Lieutenant Scott Maddox
12        Bryan Gillespie

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SONDRA CARGLE & ASSOCIATES

3

1                    I N D E X

2  CAPTION      ----------------------------------    1

3  APPEARANCES ----------------------------------    2

4


5  WITNESS:

6      DENNIS R. WALKER
            Examination by Ms. DePonte --------    4
7


8  REPORTER'S CERTIFICATE ----------------------   59

9


10  INFORMATION TO BE PROVIDED:

11  1.   Sergeant's name -------------------------   28
    2.   Letters --------------------------------   32
12  3.   Green card P 095 273 542 ----------------   37

13


14  CERTIFIED QUESTION:

15  Page 8, Line 2

16


17              IDENTIFICATION OF EXHIBITS

18  EXHIBIT NO.                   MARKED   IDENTIFIED

19  Exhibit 1                      10         11
    Exhibit 2                      10         11
20  Exhibit 3                      10         12
    Exhibit 4                      32         32
21  Exhibit 5                      32         33
    Exhibit 6                      32         33
22

23

24

25

Case 2:00-cv-00099   Document 13   Filed in TXSD on 09/21/2000   Page 13 of 83

1                    DENNIS R. WALKER,

2    having been first duly sworn, testified as follows:

3                        EXAMINATION

4    BY MS. DePONTE:

5        Q.    Let me go ahead and explain to you about a

6    deposition.  My name's Jennette DePonte.  I'm with the

7    Office of the Attorney General, Law Enforcement Defense

8    Division.  I represent Susan Lamb, the Defendant in this

9    case, the individual you sued.

10                   Could you please state your name for the

11   record?

12       A.    My name's Dennis Walker.

13       Q.    And what is your -- are you currently

14   confined in the Texas Department of Criminal Justice,

15   Institutional Division?

16       A.    Yes, ma'am.

17       Q.    And we are here today at the Dalhart Unit,

18   correct?

19       A.    Yes, ma'am.

20       Q.    And you've filed a lawsuit, Dennis R. Walker

21   versus Susan Lamb, Case Number CAC-00-99, against Ms.

22   Lamb, correct?

23       A.    Yes, ma'am.

24       Q.    And we're here to depose you today.  And let

25   me tell you a little bit -- have you ever had your

1    deposition taken before?

2        A.    No, ma'am.

3        Q.    A process of a deposition -- Ms. Wingo here,

4    Kary Wingo, is the court reporter, and she's going to

5    take down everything you say.  And you just went under

6    oath, so your testimony here today is as if you were

7    before the judge and it's under the penalties of

8    perjury.  You understand that?

9        A.    Yes, ma'am.

10       Q.    It's very important -- I'm going to go

11   through a couple of the requirements and the rules that

12   we have when we do depositions -- that you give verbal

13   answers, saying yes or no, instead of nodding your head

14   or going uh-huh or huh-uh.

15       A.    Yes, ma'am.

16       Q.    Do you understand that?

17       A.    Yes, ma'am.

18       Q.    Okay.  Also, this is a process where I ask

19   you questions and you provide answers.  Now, you are

20   here pro se representing yourself, correct?

21       A.    Yes, ma'am.

22       Q.    You also have a right, as the attorney for

23   yourself, to make objections under the rules.

24       A.    Yes, ma'am.

25       Q.    Furthermore, if I ask you a question and you

1   don't understand that question, you have the right to

2   ask me to clarify the question to where you understand

3   it.  Do you understand?

4         A.   Yes, ma'am.

5         Q.   And do you agree to do that?

6         A.   Yes, ma'am.

7         Q.   If for some reason you can't hear me -- if my

8   voice isn't loud enough for some reason -- you have a

9   right to go ahead and ask me to repeat the question or

10  speak up.  Do you understand that?

11        A.   Yes, ma'am.

12        Q.   And you agree to do that?

13        A.   Yes, ma'am.

14        Q.   And it's fair to say that if I ask you a

15  question and you answer that question, that you both

16  understood the question and that you heard the question.

17  Do you agree with that?

18        A.   Yes, ma'am, but I could be a little confused

19  in a question.

20        Q.   Well -- and that's why it's important that

21  you understand you have the right to -- if you don't

22  understand the question, to ask me to clarify it or

23  rephrase it to where you do understand.

24        A.   Okay.

25        Q.   Because, once you make that answer, I'm going

1    to presume that you understood the question and that

2    your answer is true.  Do you understand?

3           A.    Yes, ma'am.

4           Q.    Okay.

5           A.    Is there anything I can say?

6           Q.    Do you have something relating to anything

7    that you want to put -- well, I'm going to ask you

8    questions.

9                 MS. DePONTE:  Let's go off the record

10   real quick.

11                (Off-the-record discussion.

12          Q.    (BY MS. DePONTE)  What I want to start out

13   with is go ahead and ask you what are you currently

14   serving time for?

15          A.    DWI.

16          Q.    Okay.  And what is your sentence?

17          A.    20 years DWI.

18          Q.    And have you committed any other felonies?

19          A.    Other ones, yes.

20          Q.    Are you serving time for those other

21   felonies?

22          A.    No.

23          Q.    Is this the first time you've been to TDCJ?

24          A.    No.

25          Q.    And when was the time prior to this DWI?

1    A.    This one was '92.   '84.

2    Q.    And what were those times for?

3    A.    I'm going to invoke the 5th Amendment.

4    Q.    You were convicted for those crimes, though?

5    A.    No.  I'm just invoking the 5th Amendment.  I

6  don't want to answer those questions.

7    Q.    All right.  I'm going to certify the

8  question.  I believe that's an improper invocation of

9  the 5th Amendment.  But we'll just move on for the time

10  being.

11    A.    We're not talking about me; we're talking

12  about Ms. Lamb.

13    Q.    Well, I understand, but I have a right to ask

14  you about your criminal history, under the rules, under

15  Rule 609 of the Federal Rules of Civil Procedure -- I

16  mean, the Federal Rules of Evidence, but we can discuss

17  that later with the Court.

18              In Dennis Walker versus Susan Lamb, you

19  filed this lawsuit on February 28th of 2000, correct?

20    A.    Yes, ma'am.

21    Q.    And what unit were you located at during that

22  time?

23    A.    Garza West, Beeville.

24              THE REPORTER:  Garza West what?

25              THE WITNESS:  Garza West, Beeville,

1    Texas.

2        Q.    (BY MS. DePONTE)   And you would agree, during

3    that time, that Ms. Lamb was the mail room supervisor at

4    the Garza West Unit, correct?

5        A.    Yes, ma'am.

6        Q.    And the address of that unit is HC 02, Box

7    995, Beeville, Texas?

8        A.    I don't remember exactly --

9        Q.    78102.  And I'm taking this information from

10   your original complaint.  If you would like to look at

11   it to help refresh your memory, I'd be more than happy

12   to show it to you.  Would you like to do that?

13       A.    Yes, ma'am.

14       Q.    Just remember, we have to verbalize

15   everything so that she can write it down.

16       A.    I apologize.  That looks like it's my typing.

17   Okay.

18       Q.    Now, I'm here today to ask you some questions

19   about your lawsuit and get a better understanding of the

20   basis for your lawsuit.  Could you please describe the

21   basis for suing Susan Lamb?

22       A.    Two of my certified legal letters were

23   intercepted and stopped and opened.  And I assume they

24   were destroyed on the unit.  I don't know what they did

25   after they opened them.  I know they were opened and

1   read because of the hostilities that the officers that I

2   wrote the letters on gave me for several weeks, months,

3   after that.

4        Q.   Let's go in detail and step by step.  You

5   have -- you say two certified letters that you sent were

6   destroyed.  That's talk about the first letter.  And

7   prior to this deposition taking place, you handed me the

8   originals of the returned green cards.

9        A.   Yes, ma'am.

10       Q.   And I made copies of those documents.  And

11  we're going to turn those into exhibits in this

12  deposition.  What was the date of the first letter that

13  you're alleging was intercepted and allegedly destroyed?

14       A.   Well, I believe it was March 7th, 1998, is

15  what's stamped on the receipt for certified mail.  It's

16  P 095 273 792.  I received this.

17                 (Exhibit Numbers 1 through 3 marked.

18       Q.   (BY MS. DePONTE)  I'm going to hand you what

19  I've pre-marked as Walker Deposition Exhibit 1, 2 and 3.

20  Could you please identify -- oh, I'm sorry.  Let me

21  switch with you.  Could you please identify these

22  exhibits for the record?  And, when you identify them,

23  tell the court reporter which exhibit you're looking at

24  first.

25       A.   Okay.

1    Q.   And you can compare them to your originals.

2  I want you to confirm that they're the same, for the

3  record.

4    A.   All right.  I'm looking at Receipt for

5  Certified Mail, PS Form 3800, April 1995.  It is a white

6  tag with March 7th, 1998, Beeville, Texas stamped on it.

7  The number is P 095 273 792.

8    Q.   Now, is that the receipt for certified mail?

9  And it's Exhibit 1, correct?

10    A.   Yes, ma'am.

11    Q.   And that's -- is that the receipt that you

12  receive when you send out a piece of mail for certified

13  mail?

14    A.   Yes, ma'am.

15    Q.   Now, let's turn to -- and that's the same as

16  your original, correct?

17    A.   It appears to be.

18    Q.   All right.

19    A.   Yes, ma'am.

20    Q.   Let's move to Exhibit Number 2.

21    A.   Okay.  It's a Domestic Return Receipt, PS

22  Form 3811, December 1994, Article Number 095 273 792,

23  addressed to Internal Affairs Division, TDCJ-ID, P.O.

24  Box 99, Huntsville, Texas.  It's unsigned and undated by

25  the recipient and undated by the postmaster general,

1  date of delivery.

2       Q.   Is that the same --

3       A.   It's Exhibit 2.

4       Q.   Is that the same as your original that you

5  provided to the Attorney General's Office?

6       A.   Yes, ma'am.

7       Q.   Both pages?

8       A.   Yes, ma'am, both pages.

9       Q.   Then let's move to Exhibit Number 3.

10      A.   I don't have the white tag with that one.

11      Q.   I'm sorry.  What did you say?

12      A.   I don't have the receipt for certified mail

13 for this one.

14      Q.   Well, I believe -- isn't Exhibit 3 the yellow

15 card that you sent regarding Article Number --

16      A.   Yes, ma'am.  Yes, ma'am.  I apologize about

17 that.  It's PS Form 3811-A, December 1994, Domestic

18 Return Receipt (After Mailing).  And it's addressed to

19 Internal Affairs, TDCJ-ID, P.O. Box 99, Huntsville,

20 Texas, with Beeville, July 27th, 1998, 78102, United

21 States Postal Service postmark, and a Huntsville August

22 19th, 1998, 77340 United States postmark, with no record

23 of this article, P 095 273 792, going through either of

24 these postmaster's offices and -- or post offices.  And

25 it's signed by clerk's initial.  Looks like a DEA or a

1   DE.

2       Q.   And you would agree with me that this is a

3   copy of the original you provided to me earlier today to

4   make a copy of, correct?

5       A.   Yes, ma'am.

6       Q.   And it's a yellow card?

7       A.   It's a yellow card.

8       Q.   Mailing date of 3/7/98, correct?

9       A.   Yes, ma'am.

10      Q.   Now, this is the first green card you

11  claim -- or the first piece of mail you allege was

12  destroyed, correct?

13      A.   Yes, ma'am.  I don't know if it was destroyed

14  or what.  I just know that it didn't leave the farm

15  because the postmaster said there was no record of it

16  leaving the unit, going through any of the postmaster

17  offices where it was supposed to go through.

18      Q.   What evidence do you have that supports your

19  allegations that Susan Lamb either intercepted or

20  destroyed this piece of mail?

21      A.   She's the supervisor of the mail room.  She's

22  responsible for what goes on in the mail room.

23      Q.   So, you're holding her responsible for the

24  lost mail?

25      A.   Yes, ma'am.

1    Q.   You're not saying she necessarily destroyed

2  it?

3    A.   I know she knows about it and I know she

4  knows who did it, if she didn't do it.  I know she's

5  just not saying anything about it.

6    Q.   So, you don't know if she did anything to

7  your mail or not, do you?

8    A.   The office did and she's the supervisor and

9  it falls on her shoulders because she's the supervisor,

10  the same way as if Lieutenant Maddox here gets into

11  trouble, it falls on the warden's shoulders.

12    Q.   So, you're holding her responsible because

13  she's the mail room supervisor?

14    A.   At that time, yes, ma'am.

15    Q.   Okay.  Who did you send that letter to?  And

16  I guess you sent it on March 7th of 1998, correct?

17    A.   Yes, ma'am.  That's what --

18    Q.   And who did you send that letter to?

19    A.   Internal Affairs, Huntsville, Texas.

20    Q.   For the Texas Department of Criminal Justice?

21    A.   Yes, ma'am.  At Huntsville.

22    Q.   Did you send it to a specific person?

23    A.   No, ma'am.  They won't let us do that.

24    Q.   Okay.  What was the contents of the letter?

25    A.   Well, the contents of the letter is I was

1   denied my property.  I was denied access to the law

2   library and the officers were talking to inmates and

3   beating them down for no reason and using use of force.

4              The doctors weren't -- they were telling

5   inmates to get out; there's nothing wrong with you, and

6   just a general violation of PD 21, the court order rules

7   and regulations, ma'am.

8        Q.   PD 21?

9        A.   Executive directive, employee rules of

10  conduct.

11       Q.   Okay.  What -- in your understanding, what

12  does PD 21 stand for?

13       A.   Well, it's the employees rules and

14  regulations that are written by the penal code, Texas

15  Penal Code of Texas for TDC employees.  That's what I

16  understand.

17       Q.   Was there a particular officer that you were

18  complaining about?

19       A.   Yes.  It was a property officer, Ms. Bender.

20  She caused the unit to be locked down for three days

21  because she threw away some inmate's craft shop

22  equipment, knives.  And I'm missing some of my craft

23  shop equipment.  And she threw the knives away in a

24  dumpster on the unit.

25              When her sergeants and lieutenants found

1    out about it, they went to the dumpster to get it and it

2    was gone, so they had to lock the unit down.  And I was

3    complaining about Ms. Bender wouldn't let me have my

4    property, wouldn't let me look at my property and

5    various things like that, in the letter.

6         Q.    Now, was Ms. Bender the first officer you've

7    ever complained about to Internal Affairs?

8         A.    No.

9         Q.    Approximately how many times have you

10   complained about other officers to Internal Affairs?

11        A.    Right offhand, I couldn't tell you right now.

12        Q.    Did you do it at the Garza Unit?

13        A.    I complained at a later date about another

14   officer.

15        Q.    I'm talking prior to March 7th of 1998.

16        A.    Not on Garza West.

17        Q.    Okay.  At different units?

18        A.    Allred Unit.

19        Q.    Okay.  At the Garza West Unit -- when did you

20   arrive at the Garza West Unit?

21        A.    About September '96, I believe it was.  I'm

22   really not too sure.

23        Q.    Approximately.  I'm not trying to pin you on

24   a specific date, just approximate time.

25        A.    You have me at a disadvantage right now

1  because I'm kind of nervous about what I'm saying.  And

2  I would believe it's '96.

3      Q.  Okay.  It was years before you sent this

4  letter; is that correct?

5      A.  Yes, ma'am, just about.

6      Q.  A few years?

7      A.  No, I was only on there a year, for a year.

8  I wasn't even supposed to be on a year because I was

9  already in the TDC system.  I was just supposed to be

10  held there for about 14 days and then sent to another

11  TDC unit.  But they tried to keep me there up to three

12  years is what they said.

13      Q.  So, prior to March 7th of 1998, you'd been at

14  the Garza Unit approximately a year?

15      A.  Prior to March 7th of '98?  Yeah, it was

16  about a year.

17      Q.  Okay.  And during that year before you mailed

18  this letter on March 7th of 1998, had you ever mailed

19  letters through the mail system before?

20      A.  Yes, ma'am.

21      Q.  Is this the first time you are claiming that

22  your mail has ever been intercepted and allegedly

23  destroyed?

24      A.  This is the first time I had proof.

25      Q.  Okay.

1   A. The mail room, they said, why do you mail so

2 many certified letters? And I said, to make sure it

3 gets where it's going. And they said, well, we mail

4 your mail. And I said, well, that's why I certify it,

5 to make sure you do.

6   Q. Okay. How many times prior to March 7th of

7 1998 -- and just approximate; I'm not going for a

8 specific number -- approximately, had you mailed

9 certified letters at the Garza Unit?

10   A. About five, six times.

11   Q. Only five or six times in a one-year period?

12   A. Prior to March 7th, yes, about five or six

13 times. Maybe 10. It might be 10.

14   Q. So, it's not something you did on a weekly

15 basis?

16   A. Not that I know of. I was very regular about

17 it, but I couldn't tell you if I did it on a weekly

18 basis. I might have did it once every two weeks or

19 three times a month or something.

20   Q. Approximately how many times did you send out

21 letters at the Garza Unit the year before March 7th of

22 1998?

23   A. I'd say about six, seven times. It might be

24 more. I might have room to expand.

25   Q. Now, every letter you sent out, was it

1   certified or was it -- did you send letters that were

2   not certified?

3         A.    Not every -- not every letter was certified,

4   but the certified letters themselves were stamped and

5   signed and dated.   These two letters are the only ones

6   that came back.

7         Q.    I'm somewhat confused.   I want to make sure

8   it's clear for the record.   I want to know approximately

9   how many letters you sent out in the year prior to March

10  7th of 1998, whether they were certified or not.

11        A.    Well, I sent a whole bunch of letters that

12  were certified and a whole bunch that weren't.   I sent

13  more that weren't certified is what I'm trying to tell

14  you.   And I sent approximately five or six letters

15  certified.

16        Q.    Okay.   So, five or six letters certified

17  prior to March 7th of 1998?

18        A.    Yes, ma'am.

19        Q.    And all of those came back signed; is that

20  correct?

21        A.    Yes, ma'am.

22        Q.    And you had no problems with those certified

23  letters?

24        A.    Right.

25        Q.    Until March 7th of 1998, correct?

1     A.   Right.  Could I point something out real

2  quick about these two letters?

3     Q.   I'll give you an opportunity to clarify any

4  problems at the end of the deposition.  Okay?  If you

5  have anything you need to add, I'll give you that

6  opportunity.  But right now I want to move forward.

7           Now, I sent to you initial disclosure --

8  are you familiar with the fact that the Garza Unit or

9  the units keep mail logs?

10     A.   Yes, ma'am.

11     Q.   Why don't you go ahead and tell me quickly,

12  when you send out a certified mail letter, what your

13  understanding of your responsibilities are.  How do you

14  go about doing it?

15     A.   What I do is, on Garza West -- and supposedly

16  here, but they don't -- is I take the certified letter

17  to the mail room and I hand it to them.  Then, that

18  night, they give me the receipt for the certified mail

19  back stamped.

20           And, then, a week, two weeks, maybe 30

21  days later, maybe 40, I get this Domestic Return Receipt

22  back with a person -- the addressee's name or agent

23  signed on there.  And then the postmaster general dates

24  the date of delivery that they picked up the letter and

25  it comes back to my return address on the back.

1      Q.   And who prepares the green cards?

2      A.   I do.

3      Q.   And who pays for them?

4      A.   I do.

5      Q.   Now, going to Exhibit Number 2 -- now, on

6  your original, which didn't come out in the copy, there

7  is a set of orange lines at the bottom.  Is that

8  something -- are you aware whether those were there

9  before or after it goes through the mail system?

10     A.   Sometimes it's there when I get them back.

11 Sometimes it's not.

12     Q.   Okay.  Who do you think put those little

13 orange marks on there?

14     A.   Could be the mail room or it could be the

15 postmaster general going through the mail system.

16     Q.   So, you don't know?

17     A.   No.

18     Q.   So, you really don't know whether Exhibit 2

19 went through the mail system or not?

20     A.   I'm very sure it didn't.

21     Q.   You're sure it didn't?

22     A.   Yes, I'm very sure.

23     Q.   And what evidence do you have to support that

24 it did not?

25     A.   The way Ms. Bender talked to me about four

1    days later.

2         Q.   Four days after when?

3         A.   I mailed this in the mail.

4         Q.   So, you're saying on March 11th of 1998,

5    that --

6         A.   Approximately March 11th.

7         Q.   Approximately.  That's fine.  You can clarify

8    that.  What did -- what happened that made you think

9    that Ms. Bender knew about this letter?

10        A.   Well, she put me up on the fence for about

11   45 -- she ordered her -- she's a CO-3, female too.  She

12   ordered her sergeant to put me up on the fence for about

13   45 minutes and then proceeded to rename me and my

14   parental heritage about writing the letter.

15        Q.   Okay.  You're telling me that --

16        A.   What the letter talked about.

17        Q.   I'm sorry.  Let me clarify.  You're saying

18   that CO-3 Bender ordered her sergeant to put you on a

19   fence?

20        A.   Yes, ma'am.  That was ignored too.  That's

21   just the way TDC is.

22        Q.   Is it your understanding that sergeants or

23   CO-3s are higher ranking in TDCJ?

24        A.   Sergeants.

25        Q.   And what did -- she specifically mentioned

1   this letter?

2        A.    Yeah.  She said --

3        Q.    Well, what exactly did she tell you?

4        A.    She said that I had a pretty rotten attitude

5   and that anything she wanted to do was all right because

6   she was the boss and if she told me to do something, I

7   had to do it, irregardless.

8              And she said that she would give me my

9   dictionary and my wallet -- my dictionary and my

10  glasses, my reading glasses.  I couldn't even read at

11  the time.  She wouldn't even let me have my glasses.

12  She said she'd give them to me when she got ready to.

13             And then when -- I can't remember the

14  lady's name -- came from California to look at Garza

15  West Unit, I asked that lawyer, in front of the warden,

16  if I could have my glasses and dictionary.  And he

17  called her and she got it.  Gave me a good cussing over

18  that too.  Just the way it is.

19       Q.    So, what did that conversation she had with

20  you have to do with the letter?  You said she referenced

21  the letter.  How did -- tell me exactly what she said

22  about the letter.

23       A.    She said that she knew what I wrote.  She

24  said that she would give me my stuff whenever she got

25  ready.  And she said, I told you you couldn't have it.

1    I said, why?  She says, because I said so; that's why.

2         Q.   At that time, did you have a cell mate?

3         A.   Oh, about 60 of them.

4         Q.   Were you in -- what custody level were you

5    in?

6         A.   They're bunk beds.  Bunk beds.

7         Q.   Well, I'm asking you what --

8         A.   I don't know.  We were walking down the

9    bowling alley, so to speak.  It was a wide expanse, long

10   expanse of concrete.  And the inmates walk in a single

11   file.  And she pulled me out as I was going through the

12   gate.

13              She -- I asked her, I said, can I get my

14   property?  And she told Sergeant -- I have it written

15   down on some paperwork somewhere.  And she told this

16   sergeant to put me up on the fence because she was tired

17   of being asked questions about that, about my property.

18        Q.   I guess my question is what was -- were you

19   in general custody, close custody, ad seg?

20        A.   General custody.

21        Q.   General population?

22        A.   I just got mean when I got over here and

23   these captains and majors rolled me on some fictitious

24   cases.

25        Q.   All right.  What I'm trying to understand --

1   how many people watched you write that letter that you

2   sent out on March 7th of 1998?

3        A.   Probably everybody in the pod because

4   everybody was always making remarks about me writing all

5   the time and making certified letters.  They was asking

6   how I did it and how I was doing it.

7        Q.   So the record is clear, are we talking about

8   everybody in the pod meaning inmates or officers?

9        A.   Oh, officers knew about it too.

10       Q.   What evidence do you have to show that she --

11   are you claiming that Ms. Bender read that letter?

12       A.   Well, she either read the letter or she knew

13   about it or she was questioned about it.

14       Q.   Okay.  What evidence do you show that she --

15       A.   Well, like I said -- like I said, she just

16   pulled me out of line.  I don't know who was in front of

17   me, who was in back of me.

18       Q.   So, you don't know if Ms. Bender found out

19   about that letter from other officers who saw you

20   writing the letter or from --

21       A.   Well, if she found out about it from another

22   officer, then, apparently, the letter was stopped.  I

23   don't let officers look at what I'm writing.  And these

24   officers here on this unit, they don't ever see what I'm

25   writing.  I don't even like them to look at me when I'm

Case 2:00-cv-00099   Document 13   Filed in TXSD on 09/21/2000   Page 35 of 83

1    writing a letter to a lady friend.

2        Q.   Now, are you familiar with the Guijardo

3    (phonetic) class action correspondence stipulations?

4        A.   No, ma'am.

5        Q.   Okay.  And, so, you're not familiar with the

6    Guijardo class action lawsuit?

7        A.   No, ma'am.  What about --

8        Q.   And, then, other than what we've talked

9    about, is there anything else that you believe is

10   evidence to support your allegations that Ms. Lamb or

11   Susan Lamb is responsible for this letter not being

12   mailed, as you claim?

13       A.   Well, this other letter dated April 9th --

14       Q.   Well, actually --

15            MS. DePONTE:   Objection, nonresponsive.

16       Q.   (BY MS. DePONTE)   Let's stay with this letter

17   first.  Is there any other evidence regarding this

18   letter that you have not talked to me about or told me

19   about that you believe substantiates your claim?

20       A.   I invoke the 5th Amendment.

21       Q.   Well, now, if you -- you can say that the

22   other letter is evidence, if that's what you're

23   saying.  I'm not meaning to interrupt that.  But I just

24   want to make sure I give you the full opportunity to

25   tell me everything that you're going to claim at trial

SONDRA CARGLE & ASSOCIATES

1   about what you believe supports your claim that this

2   letter was destroyed or never was mailed.

3       A.   I understand that, ma'am.

4       Q.   Okay.  Is there anything else you'd like to

5   tell me about this letter?

6       A.   Not right now at this time.

7       Q.   You're going to have an opportunity to review

8   your deposition and make any corrections, if you

9   misstated something or you need to correct it.  And if

10  you think of anything between now and then, I'd ask that

11  you go ahead and supplement your deposition with that

12  information.  Do you understand that?

13      A.   Yes, ma'am.

14      Q.   So that, by the time we get to trial, you'll

15  put everything you know that supports your claim in this

16  deposition.

17      A.   Right.  That's expanding the record.

18      Q.   And you agree to that do?

19      A.   Yes, ma'am.  I told you that confidentially a

20  while ago.

21      Q.   And, so, you also talked about that you had

22  documentation to support the sergeant that you claim

23  threw you on the fence.

24      A.   Right.

25      Q.   If you could add her name or that

1    individual's --

2         A.    His name.

3         Q.    -- his name to this deposition, I would

4    appreciate that also.

5         A.    Well, right now, I can't because I don't have

6    the paperwork with me.

7         Q.    No, when you have the opportunity to correct

8    your deposition.  You can add it at that time.  And you

9    agree to do that?

10        A.    When will that happen?  Through the mail

11   system?  I mean, will I have to write it down and send

12   you a copy of everything?

13        Q.    No.  Let me go ahead and clarify.  She's

14   going to -- she's recording everything that we say here

15   today and it's going to come out in a transcript form

16   and you're going to get the original and have the

17   opportunity to make corrections to any misstatements you

18   made or mistakes you made or whatever.

19               And I'm asking you, in this area, since

20   you said you can't remember right now, if there's

21   something else you remember that supports your claim, to

22   add that in the deposition at that time.

23        A.    Yes, I will.

24        Q.    And then you'll be required to mail that back

25   to me.  You understand?

1        A.    Yes, ma'am.

2        Q.    Do you know somebody in the mail room with

3   the initials of AOC?

4        A.    AOC?  Not that I know of.

5        Q.    An officer's initials?

6        A.    No, not that I know of.

7        Q.    Okay.  What reason do you believe that your

8   mail was intercepted?  Why would they intercept your

9   mail, if you know?

10       A.    Why would they intercept my mail?  I guess

11  that's because somebody's writing Internal Affairs

12  trying to explain what's going on on this unit.

13       Q.    You had sent six other certified mails prior

14  to March 7th of --

15       A.    Well, they weren't to Internal Affairs.  Some

16  of them were to electrical companies.  Some of them were

17  to lawyers.  Some of them were to Washington, D.C.,

18  Library of Congress.  I don't know exactly where all

19  they went.

20       Q.    So, it's your position, because you were

21  writing Internal Affairs, is why your letter got --

22       A.    Yes.  Because it was addressed to Internal

23  Affairs is why it was stopped.

24       Q.    Now, are you aware what the -- you're not

25  contending that the mail room is not allowed to review

1   your mail, are you?

2        A.   Do what, ma'am?

3        Q.   You're not alleging or contending or claiming

4   that the mail room is not allowed to review certain

5   pieces of mail, are you?

6        A.   Well, they can review anything they want,

7   except legal mail, as far as I -- as well as I

8   understand the mail law.

9        Q.   So, that's your understanding, is that the

10  mail room can review anything but legal mail?

11       A.   Right.  It's supposed to be sealed.

12       Q.   What's supposed to be sealed?

13       A.   Legal mail.

14       Q.   Okay.  I wanted to make sure we understand --

15  we're clear for the record.  And you would agree that

16  this letter to Internal Affairs is not legal mail?

17       A.   No, it is legal mail.

18       Q.   Why do you believe that it's legal mail?

19       A.   Because it's what Ruiz versus Estelle, the

20  settlement, gave the inmates where we write grievances.

21  If there's problems on the unit, we write grievances; we

22  talk to the wardens; we talk to lieutenants, captains,

23  and nothing gets done.

24            These problems just keep happening over

25  and over again.  And we write grievances and the

1   grievances are answered any ol' frivolous way they want

2   to, or not returned.  So, they gave us Internal Affairs

3   to talk to to keep problems from escalating into -- and

4   I'm not threatening anything when I say this; I'm just

5   using this as an example -- is to keep problems on the

6   unit from escalating into a riot status, lock-down

7   status, abuses on the inmates or officers.

8              Because I'm just as worried about the

9   inmates' safety as I am the officers' safety.  This

10  unit's very understaffed.  It needs to come up to

11  compliance.

12      Q.   So, do you have anything given to you that

13  says that any mail sent to Internal Affairs was

14  equivalent to legal mail?

15      A.   It's in the mail records.  It's in the Ruiz

16  versus Estelle, I believe.

17      Q.   You believe it's in that?

18      A.   I believe there's a record of it somewhere

19  that it says it's considered legal mail.

20      Q.   That's your understanding?

21      A.   Yes, ma'am.

22      Q.   Now, I'd also asked you today to bring a copy

23  of -- you said you had a copy of the letters you sent.

24      A.   I looked for them.  I couldn't find them.  I

25  just got back on the chain.

1      Q.   I just -- it's just a question.  I asked you

2  to bring that, correct?

3      A.   Yes, ma'am.

4      Q.   And you've told me that you cannot locate

5  those documents at this time; is that correct?

6      A.   Right.

7      Q.   I'm going to ask that, when you locate those

8  documents --

9      A.   Yes.

10      Q.   -- that you mail me a copy of those letters.

11      A.   I'll raise my right hand.  I promise you I

12  will.

13      Q.   And you agree to do that?

14      A.   Yes, ma'am.  I'm the one telling the truth.

15      Q.   Now, let's go to the second letter that you

16  allege was intercepted by Ms. Lamb.  And I'm going to go

17  ahead and mark Deposition Exhibit 4, Deposition Exhibit

18  5 and Deposition Exhibit 6.

19              (Exhibit Numbers 4 through 6 marked.

20      Q.   (BY MS. DePONTE)  I'm going to hand these

21  items to you and have you identify them and compare them

22  to your original records and confirm that they are

23  complete and accurate.

24      A.   Yes.  It's Exhibit 4, Number P 095 273 524,

25  postdated April 9th to Internal Affairs.  This looks

1    like a true and correct copy, Exhibit 4.  Exhibit 5

2    addressed to Internal Affairs Division, P.O. Box 99,

3    Huntsville, Texas 77340, P 095 273 524.  It seems to be

4    a true and correct copy, even down to the arrows on the

5    Received By and Signature, the two arrows that are

6    there.

7              Exhibit 6, Domestic Return Receipt

8    (After Mailing) to Internal Affairs, yellow card,

9    Article Number P 095 273 524, Beeville, Texas 78102,

10   July 27, 1998, United States Postal Service postmark and

11   a Huntsville, Texas 77340, August 19th, 1998 postmark.

12   No record of this article going through either

13   postmaster general's offices, signed by DE -- clerk

14   initials DEA.  It looks like a true and correct copy.

15        Q.   I'm going to turn your attention -- go ahead

16   and actually tell me -- you mailed this second letter on

17   April 9th of 1998, correct?

18        A.   Yes, ma'am.

19        Q.   And what was the basis and content of that

20   letter?

21        A.   It's about a J.J. Garcia, Officer J.J.

22   Garcia.  I believe it was about Officer J.J. Garcia.

23        Q.   And what did it -- was it mailed to Internal

24   Affairs?

25        A.   Yes, ma'am.

1        Q.    What did it say?

2        A.    Well, abuse of authority, a code of

3    authority.  It was -- he assaulted me and then he made a

4    homosexual advance towards me.  And then he threatened

5    me with telling all his Hispanic homeboys that -- to

6    jump on me and beat me up.  And there were two killings

7    on the Garza West Unit at that time.  And just stealing

8    my personal property, two rolls of stamps.  I finally

9    got those back.  And grievances that were being denied

10   and complaints about the grievance coordinator and

11   general all-around conduct of the officers on the unit,

12   including the major and the wardens and captains.

13       Q.    Now, when you give a letter to the mail room

14   certified mail, what were the hours of the mail room at

15   the Garza Unit in April of 1998?

16       A.    I don't know.  I can't remember that far and

17   I don't remember exactly what they were doing.

18       Q.    Well, I guess what I'm trying to clarify is,

19   if you give a letter close to the end of the hours, is

20   it possible a letter could be mailed the next day?

21       A.    Yes.

22       Q.    And you're not complaining if a letter was

23   mailed the day after you handed it in?

24       A.    No.  What I was complaining of is the letter

25   didn't arrive at its destination.

1     Q.   I'm going to pass to you what is the Garza --

2     A.   Were you going to let me read that about

3 that -- what you asked me about a little while ago?

4     Q.   I'm sorry?

5     A.   You said on the telephone you was going to --

6 if I wasn't aware of that mail, that you were going to

7 let me read it.

8              MS. DePONTE:  Let's go off the record

9 for a minute.

10             (Off-the-record discussion.)

11              MS. DePONTE:  Off the record, Mr. Walker

12 inquired about the Guijardo class action and wanted to

13 know its relevancy to this lawsuit.  And I informed him

14 that I was merely asking the question to understand

15 whether or not he was filing this lawsuit in a belief of

16 whether his lawsuit is part of the Guijardo class

17 action.

18     Q.   (BY MS. DePONTE)  And your answer to that

19 was?

20     A.   No.

21     Q.   Okay.  And, in fact, you stated that you

22 didn't want to be a part of the Guijardo class action;

23 is that correct?

24     A.   Yes, ma'am.

25     Q.   Okay.  Now, I'm going to pass you mail logs

1   that are in-coming mail logs from March 1, 1998, through

2   April 1, 1998, and dated April 10th of 1998.

3                    MS. DePONTE:  I'm going to -- what's

4   Bate's stamped as Document Number 3, which has

5   previously been provided to Mr. Walker in initial

6   disclosure.

7        Q.   (BY MS. DePONTE)  I'm going to draw your

8   attention to -- 1, 2, 3, 4, 5 -- six blocks under

9   Special.  Do you see that part?

10       A.   Yes, ma'am.

11       Q.   Okay.  And you see an inmate's name that says

12   Walker, Dennis, correct?

13       A.   Yes, ma'am.

14       Q.   Is this your inmate number, 655576?

15       A.   Yes, ma'am.

16       Q.   Here it says:  Green card received 4/13/98,

17   and it has a P 095 273 542.

18       A.   42, yeah.

19       Q.   And this green card says 524.

20       A.   Right.

21       Q.   Would it be your position that these are two

22   different letters?

23       A.   No, because this is addressed to Warden

24   Anderson and this is addressed to Internal Affairs.

25       Q.   Okay.  Do you have the green card for Warden

Case 2:00-cv-00099   Document 13   Filed in TXSD on 09/21/2000   Page 46 of 83

1  Anderson?

2      A.   I probably do, but, like I said, it's in my

3  property and I can't get to it right now.

4      Q.   Do you believe you mailed these two things on

5  the same day?

6      A.   No, ma'am, I don't think so.  Might be a day

7  or two apart from each other, but I don't think --

8      Q.   I'm going to ask that, when you go back to

9  your cell or your area, if you could locate the green

10  card 542, or this green card, P 095 273 542.

11      A.   Right.

12      Q.   And I would like to get a copy of that.

13      A.   Okay.

14      Q.   It seems to me that 542 and 524 are probably

15  an inverse number.

16      A.   Yeah, you mentioned that the other day.  And

17  I looked at it and said, well, I can understand why you

18  would say that, but I didn't --

19      Q.   Well, in fact, if you look at this green

20  card, the second number has been marked out, correct?

21      A.   Uh-huh.

22      Q.   And written over, right?

23      A.   Uh-huh.

24      Q.   And the number under that 2 is a 4; is that

25  correct?

1      A.    Could be a 4.  Could be a 4.

2      Q.    Okay.  I'm just trying to clarify if I've got

3  inverse numbers or something.  Now, you mentioned the

4  other day that you sent out three letters approximately

5  the same time that you sent them to Internal Affairs.

6  Who did you send them to?

7      A.    Internal affairs, Warden -- whatever his name

8  was.  They was going through a warden about every three

9  weeks.  The warden, Internal Affairs, grievance

10  coordinator, and director of TDC.

11      Q.    And did all three of those letters have the

12  same content in them?

13      A.    Yes.  They were carbon copies.  And I kept a

14  copy of it.  Special Agent Ruiz, Internal Affairs,

15  received a copy at a later date, about -- it was almost

16  a year later.  And I showed him, another officer there.

17  I was real sick at the time.

18            And he's the one who introduced me to

19  Ruiz.  I wrote the letter to Special Agent Ruiz at

20  Internal Affairs in the Beeville Unit and he has a copy

21  of the letter.  And he -- about five days later, they

22  transferred me up here.

23      Q.    So, Internal Affairs ultimately got the

24  letter that you sent out on --

25      A.    Only the one I wrote to Ruiz.

Q.    Actually, I'd ask that you go ahead and let
me finish the question --

A.    Oh, I'm sorry.

Q.    -- so it's clear on the record.  What I'm
asking is, ultimately, the letter that you sent to --
you allegedly sent to Warden Anderson and to Internal
Affairs and to the director of TDCJ-ID -- which I
believe was Gary Johnson?

A.    I believe so.

Q.    You're claiming that that letter ultimately
got to Investigator Ruiz?

A.    Yes, ma'am.

Q.    With the Internal Affairs?

A.    That's what I was told and that's the address
I put on the letter, but it was -- the white receipt was
dated the 19th and the green card was dated the 20th.
Both of them were the same stamps, same coloring, same
type stamp and all that on the letter.

Q.    So, you're saying that the letter was resent
to Internal Affairs?

A.    No.

Q.    Well, I'm not understanding.  You said the
19th, and I don't see on Exhibit 4, 5, or 6 --

A.    No, no, not these.  Not these.  Not these.

Q.    Let's be clear for the record.  What letter

1    are you talking about now?

2        A.   The letter that I mailed to Special Agent

3    Ruiz of the Internal Affairs on the Beeville Unit.   The

4    receipt for certified mail, white tag, was stamped in

5    red, like this, on the 19th.   And I believe on the 20th

6    it was stamped in red on the Domestic Return Receipt,

7    only one day.

8                    And, in actuality, that's only about a

9    12 -- 14-hour period.   So, that letter didn't even leave

10   the unit, didn't even go to the postmaster's office and

11   then come back.

12       Q.   But it did get to an Internal Affairs

13   investigator, correct?

14       A.   I believe it did, but not through the chain

15   of command that it was supposed to.

16       Q.   So, you have a problem that it got to the

17   right person?

18       A.   I was moved 5 days -- 5 to 10 days later.

19                MS. DePONTE:   Objection, nonresponsive.

20       Q.   (BY MS. DePONTE)   Do you have a problem that

21   it got to the right person, that it was received by an

22   Internal Affairs investigator?

23       A.   Yes, I believe it was received by an Internal

24   Affairs Investigator, but I was never notified of the

25   fact.   I'm just assuming that somebody did something

1  right.

2      Q.  But you don't have a problem with the fact

3  that you were transferred and the Internal Affairs

4  investigator received your letter, do you?

5      A.  Not -- no, not that I know of.

6      Q.  I want you to turn to the second page of

7  Exhibit 7 (sic).  And this is --

8      A.  There's Exhibit 6.  And this is the page

9  after Exhibit 6?

10     Q.  Oh.  I'm sorry.  Exhibit 6.

11     A.  Okay.

12     Q.  Okay.  And this is regarding Article Number

13  095 273 524, correct?

14     A.  Yes, ma'am.  That's what I have.

15     Q.  And on the second page, if you look at the

16  top, there's a stamp mark saying Houston, Texas, and

17  then it has April 20th, correct?

18     A.  Yes, ma'am.

19     Q.  Okay.  Do you have any evidence that that's

20  not coming from the postmaster's office?

21     A.  That has to, because the postmaster general

22  is the one that sent this one.

23     Q.  Right.  So, your green card went through the

24  postmaster's office?

25     A.  That's not a green card.  That's a yellow

1  card.

2      Q.   Go ahead and check your original.  Now, after

3  looking at your original, would you agree that the

4  original --

5      A.   No, this isn't it.

6      Q.   What isn't what?

7      A.   These aren't the same two cards.  It's two

8  different cards.

9      Q.   Let me see.  And what -- okay.  This got

10  mixed up.  Well, let's go from your original.  And I

11  need to make sure we get these all right.  Actually,

12  what makes you believe that these are two different

13  cards?  Hold on.

14                  MS. DePONTE:  Let's go off the record

15  real quick.

16                  (Off the record.

17      Q.   (BY MS. DePONTE)  Just to clarify the record,

18  we had the wrong exhibit.  We're looking at Exhibit 5,

19  which is a photocopy of the green card, Article Number

20  P 095 273 534.  Now, look on Page 2 of that document.

21      A.   Yes, ma'am.

22      Q.   And compare that with your original.  And you

23  would agree -- you've compared it?

24      A.   Well, yes, ma'am.  They look -- both sides

25  look the same -- look alike.

1    Q.   And you've already agreed beforehand that

2  that stamp mark at the top, it comes from the post

3  office, correct?

4    A.   I don't know where it comes from.  I'm not

5  agreeing to that.

6    Q.   Where do you think that mark came from?

7    A.   They could have had it in the mail room, as

8  far as I know.

9    Q.   You believe the mail room has the capacity to

10 do post office stamping?

11   A.   That's how the mail room stamps the white

12 tag.

13   Q.   Okay.  Well, you look at the red tag and your

14 red tag is red ink, right?  Correct?

15   A.   Yes, ma'am.

16   Q.   Now, look at the back of your green card.

17   A.   See, the reason why I don't believe this went

18 anywhere is because this was dated April 9th after I had

19 problems with the March 7th, the same year, April 9th,

20 1998.  This was mailed after March 7th that I noticed a

21 problem.

22           And you see right there is two little

23 arrows.  And on the panel I said, please sign the

24 signature and date card.  And nobody did.  Nobody signed

25 it and nobody dated it.

1    Q.   But your complaint --

2    A.   After I requested that it be done, ma'am.

3    Q.   All right.  But your complaint is that it

4  didn't go to the US Post Office, correct, that somebody

5  intercepted it and either destroyed it or got rid of it,

6  never mailed it, correct?

7    A.   Yes, ma'am.

8    Q.   If there's a postmark sign from the post

9  office on the back of that green card, that would -- you

10  would agree that that would mean it went to the post

11  office?

12    A.   No.

13    Q.   So, how did that postmark get on there?

14    A.   I would assume the mail room did it.

15    Q.   Do you have any evidence of that?

16    A.   No, ma'am.

17    Q.   So, you're just speculating?

18    A.   Yes, ma'am.  I'm speculating, after I

19  requested that they sign it and date it and they still

20  didn't do it.

21    Q.   Well, now, wouldn't that be the fault of the

22  US Post Office for not getting that signature?  Wouldn't

23  that be the US Post Office's fault, correct?

24    A.   Well, since the mail room is the post office,

25  yes, it would be their fault.

1      Q.   So, it's your position or understanding that

2  the Texas Department of Criminal Justice mail room is

3  identical to the Federal Post Office?

4      A.   They honor the same rules and regulations.

5  Since we're incarcerated, they get to look at our

6  personal mail, but they can't open our legal mail

7  unless -- that's the way I understand it.

8      Q.   Who do you believe governs the TDCJ mail

9  system?

10     A.   Government.  Texas Penal Code.  Federal

11 Postmaster.

12     Q.   You believe the Federal Postmaster is the

13 employer of the --

14     A.   All the ones I just mentioned.

15     Q.   All three of them?

16     A.   The penal code and the Federal Postmaster.

17 Why?  Who does?

18     Q.   Actually, in this type of situation, I can

19 ask questions and you have to answer the questions, but

20 this is your lawsuit and it's not proper for you to ask

21 me questions.

22              What evidence or what reasons do you

23 have for believing that Susan Lamb intercepted the

24 letter that you mailed on March 9th of 1998 and did not

25 mail that letter?

1       A.      What reason, feeling?  Because they're not

2    signed.  Neither one of them's signed and dated, even

3    after I requested the second one be signed and dated.

4    I'm sure that I can find in my property where I mailed

5    another letter through a lawyer and it was signed and

6    dated.

7       Q.      Is there any other evidence that you have

8    that Susan Lamb failed to mail your letter on March 9th

9    of 1998?  I'm sorry.  April 9th of 1998.  And I'm only

10   talking about the April 9th of 1998 letter right now.

11      A.      Right now at this time, no.  I can't get my

12   hands on it right now.  But we talked a little while ago

13   that, when I get it, I'll give it to you.

14      Q.      And what are we talking when you get it?

15   What's it?

16      A.      When I get the other evidence, get copies of

17   it, I'll be glad to mail it to you.

18      Q.      And what evidence do you believe you have?

19      A.      The letters, documents, notations.

20      Q.      Personal notations?

21      A.      Not by me.  It's by other people.

22      Q.      By who?

23      A.      Post office, other employees inside the mail

24   room.

25      Q.      Okay.  Are you saying other employees made

1    statements to you?

2        A.    No.

3        Q.    What are you saying?  I'm not quite following

4    you when you say by other employees.  Are you talking

5    about other green cards?

6        A.    Yes, ma'am, other green cards.

7        Q.    Okay.  Is there anything else that makes you

8    believe that this letter that you sent on April 9th of

9    1998 was not mailed?

10       A.    The way J.J. Garcia approached me and

11   attacked me.

12       Q.    Okay.  And when did he allegedly approach you

13   and attack you?

14       A.    Well, he approached me in the walkway --

15   bowling alley is what the nickname of it was -- the long

16   expanse of concrete where the inmates walk in a single

17   file.  And he told me that I had a big mouth.  And then,

18   about a week -- maybe two weeks later, I was on the

19   medical chain down in Galveston and he locked me -- he

20   told -- there was about seven other inmates in there.

21   They were all Spanish.

22                    And he told me that I had a big mouth

23   and he locked me in there with the Hispanics, and,

24   basically, saying this guy's a snitch; take care of him,

25   and locking the gym and leaving.

1      Q.   And what does that have to do --

2      A.   He denies being there.

3      Q.   What evidence do you have that he was aware

4 of this letter?

5      A.   Because he said I had a big mouth, that I

6 didn't have -- I shouldn't have said what I did,

7 shouldn't have wrote what I did.  I said, it's not me;

8 it's you; you're the one that's being aggressive.

9      Q.   And, in fact, he used the words, you

10 shouldn't have wrote what you wrote?  Or what exactly

11 did he say?

12     A.   I couldn't tell you exactly what he said, but

13 it was approximately -- basically what it was.  It was

14 so many years ago and so many officers have harassed me

15 since then, ma'am.

16     Q.   Were you talking about the letter or was he

17 just telling you you had a big mouth?

18     A.   No, he was talking about the letter.

19     Q.   And you know that -- undoubtedly know that

20 because he referenced that specific letter?

21     A.   He didn't reference the specific letter, but

22 when somebody's angry at you and they, in so many words,

23 they say things to you, you know what they're talking

24 about, even though they don't come out and say, this is

25 what I'm talking about right here and hold up a little

1  picture and say, this is it; this is what I'm talking

2  about.   Then you know, in your mind, in your inner self,

3  that you know that's what they're talking about.

4      Q.   And is it fair to say -- just like the first

5  letter -- you're claiming that Susan Lamb is responsible

6  for the second letter because she was the mail room

7  supervisor, correct?

8      A.   Both of them.   She's responsible for both of

9  them because she was the supervisor.

10     Q.   And you don't have any evidence or don't know

11 if she's the one specifically who allegedly destroyed

12 your mail?

13     A.   This is -- I have a little bit other, but I

14 don't have it with me right now.

15     Q.   Well, that's why we're here today.

16     A.   Well, like I said, I told you I'd get it to

17 you as soon as I get it.

18     Q.   Well, I'm asking you a specific question

19 that's kind of a yes or no question.   Earlier you

20 testified in the first --

21     A.   Well --

22     Q.   Earlier you testified in the first green

23 card -- or the first letter -- that she's responsible

24 because she's the mail room supervisor.

25     A.   Right, she's responsible.

1    Q.   Whether she did it or somebody else did it,

2  she's responsible.

3    A.   She's responsible, right.

4    Q.   And that you don't know whether she did or

5  other officers in the mail room did it, correct?

6    A.   Right.

7    Q.   And that would be fair to say the same is

8  true for the second letter, correct?

9    A.   She was the supervisor.  She was responsible.

10    Q.   All right.  What are you alleging are your

11  damages in this case?

12    A.   Well, let's see.  Right now I can't put all

13  that together right now until I look at all my letters

14  and piece them all together.  But I do want off this

15  unit.

16    Q.   Okay.  In your relief, you ask for injunctive

17  relief.  And you're aware that Susan Lamb is no longer

18  employed with the Texas Department of Criminal Justice,

19  correct?

20    A.   I didn't know that until you told me.

21    Q.   Okay.  What type of injunctive relief are you

22  looking for, since you're no longer at the Garza Unit?

23  Was this west or east?

24    A.   Do what?

25    Q.   Was it the Garza West or East Unit?

1      A.    I was on both units for -- I was on Garza

2  East for three days.

3      Q.    Which unit did this happen?

4      A.    Garza West.

5      Q.    Okay.  Thank you.  And since you're no longer

6  on Garza West, your mail's not being tampered with by

7  Garza West?  You'd agree with that, correct?

8      A.    Right.

9      Q.    And you ask for monetary damages in your

10 complaint.

11     A.    Yes.

12     Q.    Okay.  And you're saying you don't know what

13 your monetary damages are?

14     A.    Not yet.  Not until I get everything put

15 together.

16     Q.    Do you have an estimate of how much monetary

17 damages you're alleging?

18     A.    No.

19     Q.    We've talked about your two letters.  Is

20 there any other allegations in your complaint that we

21 have not covered?  You say that your due process rights

22 were violated because these letters were not mailed.  Is

23 there anything else that you complained about in your

24 complaint that we have not talked about today?

25     A.    That complaint just about covers it.

1     Q.   Okay.  Is there anything that we have not

2   talked about in this deposition regarding these letters

3   that you can think of right now before we -- I'm pretty

4   close to finishing this deposition -- that you feel is

5   necessary to inform me about?

6     A.   Right now, until I get all my paperwork

7   together and read everything all together and categorize

8   it, we're doing okay.  I don't know of anything else I

9   can think of to talk about.

10    Q.   Okay.  And we talked about some of the

11   documentation that you're looking for are the copies of

12   the letters, correct?

13    A.   Right.

14    Q.   And other green cards from other letters that

15   you sent, correct?

16    A.   Yes.

17    Q.   And to confirm whether or not this

18   P 095 273 542, whether this is a misprint or whether --

19    A.   That these 4 and 2 were inversed?

20    Q.   Correct.  And you're going to clarify that

21   for me, correct?

22    A.   Right.  Yes, ma'am.

23    Q.   And on the record I just want to put that on

24   Friday we talked.  There is a summary judgment deadline

25   coming up on the 22nd of this month.  And you said you

1  were unopposed, should it be necessary for us to extend

2  that deadline?

3       A.    I would appreciate it if you would because I

4  don't know when I'm going to get all my property.

5       Q.    I don't know.  I'll probably not move, but I

6  don't know.  And I'm asking you ahead of time if you are

7  opposed.  If you need to move for an extension of that

8  deadline, you can petition the Court and ask them for an

9  extension of that deadline.  And I'll tell you on the

10 record that I'm unopposed to you moving that deadline

11 back.

12      A.    Okay.  Because y'all -- I've been on the

13 chain quite a bit, off the unit and back, and my

14 property's over here, over in this unit this place.

15 It's pretty well strung out right now.  So, when you

16 called me I just -- the day after I arrived on the

17 chain, and I've been moved two times since then.  So,

18 it's kind of hectic to be an inmate on this unit.

19           MS. DePONTE:  Let me take a one-minute

20 break and then we'll sum up and I'll let you get back to

21 your business.

22           (Off the record.

23      Q.    (BY MS. DePONTE)  Mr. Walker, we're back on

24 the record.  You were noticed of the intention of my

25 office to take this deposition here today?

1       A.    Yes, ma'am.

2       Q.    Attached was a subpoena, which has Exhibit A,

3   which provides a list of documents you were to bring

4   today.

5       A.    Yes, ma'am.  There's a lot of that that y'all

6   talked about I don't have.  There's no way I could have

7   it.

8       Q.    Well, that's fine.  And what type of things

9   are you talking about that you don't have?

10      A.    Well, I couldn't tell you that right now

11  because what y'all are calling it may be not what I'm

12  calling it.

13      Q.    Well, you did bring the certified mail green

14  cards?

15      A.    Yes, ma'am.

16      Q.    As I requested.

17      A.    Both of them.

18      Q.    The March 7th and April 9th.  And you did

19  bring the yellow cards that you sent to the postmaster.

20  Did you review any documents before preparing for this

21  deposition, prior to coming here this morning?  Did you

22  review any documents for this lawsuit?

23      A.    No, ma'am.

24      Q.    Okay.

25      A.    Not that I know of.  This is all I had in my

1  possession at this time.  Some of it -- probably some of

2  it's at the house, home in Corpus Christi.  You know, I

3  had to get -- y'all came in pretty quick.

4       Q.   I'm sorry?  Say that again.

5       A.   Some of it's at my house in Corpus Christi

6  and some of it's here and there.  Trying to get it is

7  going to be kind of tough.

8       Q.   And when did you come into TDCJ for this most

9  recent crime?

10       A.   '95.

11       Q.   And what units have you been on since '95?

12       A.   I went through 16 units in 30 days.

13       Q.   Okay.  So, from 1996 until -- you said

14  approximately '96, '97 you were at the Garza West Unit?

15       A.   Yes, ma'am.

16       Q.   And how long after these incidents of these

17  letters that you're alleging form the basis of this

18  lawsuit did you leave the Garza West Unit?

19       A.   I left the Garza West Unit two days before

20  Thanksgiving.

21       Q.   Of what year?

22       A.   Well, Garza West Unit, I left -- I arrived

23  here two days before Thanksgiving.

24       Q.   So, in November of last year, '99?

25       A.   No.  '98.  November of '98.

1      Q.   Okay.

2      A.   In '98 I arrived here two days before

3   Thanksgiving and almost got locked down and beat down on

4   Thanksgiving Day just because I said hi to somebody in

5   the chow hall.

6                MS. DePONTE:   I think that will conclude

7   our deposition here today.   Thank you for your time.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CHANGES AND SIGNATURE

2

3  PAGE      LINE      CHANGE                    REASON

4

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

1        I, DENNIS R. WALKER, have read the foregoing
deposition and hereby affix my signature that same is
2    true and correct, except as noted above.

3

4

5
                  _____
6                 DENNIS R. WALKER

7

8   THE STATE OF TEXAS    )
                     )
9   COUNTY OF _____  )

10

11       Before me, _____, on this

12   day personally appeared DENNIS R. WALKER, known to me

13   (or proved to me under oath or through _____)

14   (description of identity card or other document)) to be

15   the person whose name is subscribed to the foregoing

16   instrument and acknowledged to me that they executed the

17   same for the purposes and consideration therein

18   expressed.

19       Given under my hand and seal of office this

20   _____ day of _____, _____.

21

22
                 _____
23                 NOTARY PUBLIC IN AND
                 FOR THE STATE OF _____

24

25   My Commission expires _____.

1   STATE OF TEXAS)

2

3

4

5       I, KARY A. WINGO, CSR, RPR and Notary Public in

6   and for the State of Texas, certify that the caption to

7   this deposition correctly states the facts set forth

8   herein, that the examination of the witness named in

9   said caption was correctly reported in Stenograph by me

10  at the time and place and under the Agreement set forth

11  in said caption, and has been transcribed from

12  Stenograph into writing by computer transcription under

13  my direction and supervision in the foregoing

14  transcript; and that said transcript contains a correct

15  record of the proceedings had at said time and place.

16      I further certify that I am neither attorney or

17  counsel for, nor related to or employed by, any of the

18  parties to the action in which this deposition is taken,

19  and further, that I am not a relative or employee of any

20  attorney or counsel employed by the parties hereto, or

21  financially interested in the action.

22      I FURTHER CERTIFY that the charges for the

23  preparation of the foregoing completed deposition are

24  $279.75 for the original transcript charged to Counsel

25  for Defendant.

1    GIVEN UNDER MY HAND AND OFFICIAL SEAL of office on

2  this the 18th day of September, 2000.

3

4    _____
     KARY A. WINGO, CSR, RPR

5    Notary Public in and for
     the State of Texas

6    Certificate No. 3098
     Expiration Date: 12-31-00

7    4103 W. 49th St.
     Amarillo, Texas 79109

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P 095 273 792

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail *(See reverse)*

| Sent to I.M.O. HUNTS VILLE TX | | |
|---|---|---|
| Street & Number BOX 99 | | |
| Post Office, State, & ZIP Code HUNTSVILLE. TX. 77340 | | |
| Postage | $ | |
| Certified Fee | ✓ | |
| Special Delivery Fee | | |
| Restricted Delivery Fee | | |
| Return Receipt Showing to Whom & Date Delivered | | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | | |
| TOTAL Postage & Fees | | |
| Postmark or Date | | |

PS Form **3800,** April 1995

DENNIS WALKER 655576 C2-42



Walker
**DEPOSITION
EXHIBIT**

PENGAD 1-800-631-6989

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write "Return Receipt Requested" on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

**Is your RETURN ADDRESS completed on the reverse side?**

I also wish to receive the following services (for an extra fee):
1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:
INTERNAL AFFAIRS DIVISION
TDCJ-ID
P.O. Box 99
HUNTSVILLE, TX. 77340

4a. Article Number
P095 373 792

4b. Service Type
☐ Registered    ☑ Certified
☐ Express Mail  ☐ Insured
☐ Return Receipt for Merchandise  ☐ COD

7. Date of Delivery

5. Received By: (Print Name)

8. Addressee's Address (Only if requested and fee is paid)

6. Signature: (Addressee or Agent)
X

PS Form 3811, December 1994          Domestic Return Receipt

**Thank you for using Return Receipt Service.**



Walker
DEPOSITION
EXHIBIT

UNITED • TATES POSTAL SERVICE

First-Class Ma.l
Postage & Fees Paid
USPS
Permit No.

● Print your name, address, and ZIP Code in this box ●

DENNIS WALKER 655576
GAREN WEST UNIT
HCO2 BOX 995
BEEVILLE, TX.
78102

SENDER: Complete items 1 and/or 2 for additional services. Complete items 3, and 4a & b. Print your name and address on the reverse of this form...

□ 1. □ Return receipt WAS paid for at time of mailing.

□ 2a. Return receipt WAS NOT paid for at time of mailing.

□ 2b. Return receipt showing addressee's address WAS paid for at time of mailing.

3. Article Addressed To:

I. AFFAIRS   TDCJ-ID
P.O. Box 99
HUNTSVILLE, TX 77340

was paid for at time of mailing.

I also wish to receive the following services (for an extra fee):

1. □ Addressee's Address
2. □ Restricted Delivery

Consult postmaster for fee.

____ not paid for at time of mailing.

4. Article Number
P 095-213-798

5. Mailing Date
3-7-98

6. Type of Service
□ COD   ☒ Certified   □ Numbered Insured
□ Return Receipt for Merchandise   □ Express Mail   □ Registered

7. Delivery Date

8. Delivered to the following (Individual, company, or organization):

9. Delivery Date

10. Address (Complete only if item 2b is checked):

11. Postal Records
Show:
□ Delivery was made
□ Delivery was not made

12. Clerk's Initials

Delivery Clerk's
Postmark

PS Form **3811-A,** December 1994        Domestic Return Receipt (After Mailing)

WALKER
DEPOSITION
EXHIBIT
3

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fe
USPS
Permit No. G

● Enter name and address of customer in this box ●

Dennis WALKER 655576
GARZA WEST Cwit
HCC2 Box 995
Beeville, TX 78102-9423

P 095 273 524

## US Postal Service
# Receipt for Certified Mail
No Insurance Coverage Provided.
Do not use for International Mail *(See reverse)*

| | |
|---|---|
| Sent to *INTERNAL AFFAIRS TDCID* | |
| Street & Number *P.O. BOX 99* | |
| Post Office, State, & ZIP Code *HUNTSVILLE TX. 77340* | |
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | |
| Postmark or Date | |

6-30

c

655576

DENNIS WALKER

PS Form **3800**, April 1995



walker
DEPOSITION
EXHIBIT
4

PENGAD 1-800-631-6989

**Is your RETURN ADDRESS completed on the reverse side?**

**SENDER:**
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write "Return Receipt Requested" on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):

1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:

INTERNAL AFFAIRS DIVISION
TDCJ - ID
P.O. Box 99
HUNTSVILLE, TX. 77340

| 4a. Article Number |
|---|
| P 095 273 524 |

4b. Service Type
☐ Registered          ☑ Certified
☐ Express Mail        ☐ Insured
☐ Return Receipt for Merchandise  ☐ COD

7. Date of Delivery

5. Received By: (Print Name)

8. Addressee's Address (Only if requested and fee is paid)

6. Signature: (Addressee or Agent)
X

PS Form 3811, December 1994          Domestic Return Receipt

**Thank you for using Return Receipt Service.**

DEPOSITION
EXHIBIT
5

TATES POSTAL SERVICE

• Print your name, address, and ZIP Code in this box •

DENNIS WHITKER
655576
HCO2 BOX 995
BEEVILLE, TX.
78102-9923

CS-26

First
Posta
USPS
Permit No. G-10

CUSTOMER: Complete Shaded areas and items 1-6, and enter your name and address on the reverse.

☐ 1. Return receipt WAS paid for at time of mailing.

was paid for at time of mailing.

☑ 2a. Return receipt WAS NOT paid for at time of mailing

☐ 2b. Return receipt showing addressee's address WAS paid for at time of mailing

3. Article Addressed To:

Internal Affairs TDCJ-ID
PO Box 99
Huntsville TX 77340

HUNTSVILLE TX 78142

JUL
27
1998

Attach fee as shown on the Form if return receipt
was not paid for at time of mailing.

4. Article Number

P 095273-524

5. Mailing Date

4-9-98

6. Type of Service

☐ COD   ☐ Certified   ☐ Numbered Insured
☐ Registered   ☐ Express Mail

Return Receipt
for Merchandise

8. Delivered to the following individual, company, or organization:

9. Delivery Date

10. Address (Complete only if item 2b is checked):

11. Postal Records
Show:

☐ Delivery was made
☐ Delivery was not
made

12. Clerk's Initials

PS Form 3811-A, December 1994          Domestic Return Receipt (After Mailing)

HUNTSVILLE
19
1998
POSTMARK
Delivery Office

DEPOSITION
EXHIBIT

UNIT... STATES POSTAL SERVICE

First-Class Mail
Postage & F...
USPS
Permit No. G

● Enter name and address of customer in this box ●

Dennis WALKER 655576
GARZA West Unit
HC02 Box 995
Beeville, Tx 78102-9423

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| *DERRICK WEBSTER*, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. C-98-211 |
| | § | |
| *WILLIAM A. BOOTHE, ET AL.*, | § | |
| Defendants. | § | |

# Exhibit B

# William Boothe's affidavit

CibPDF—www.fastio.com

Case 2:00-cv-00099  Document 13  Filed in TXSD on 09/21/2000  Page 81 of 83

# AFFIDAVIT

STATE OF TEXAS     §
                             §
COUNTY OF BEE    §

BEFORE ME the undersigned authority, personally appeared Lillie Harris, who being duly sworn, stated as follows:

"My name is Lillie Harris. I am over twenty-one years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated. I am employed by the Texas Department of Criminal Justice as the Mailroom Supervisor over the Garza West Prison Facility in Beeville, Texas. I have held this position since July 2000. Prior to July 2000, I held the position of Assistant Mailroom Supervisor at the Garza West Unit from January 1998 to July 2000. From July 1995 until December 1997, I was a mailroom clerk at the Garza East Prison Facility.

I have been requested by the Office of the Attorney General to provide the following information regarding the Garza West Mailroom Procedures for mailing certified mail return receipt requested for inmates.

An inmate may send mail certified return receipt requested at his own expense. He is responsible for completing the certified mail information prior to giving his mail to the mailroom. Once the mailroom receives a certified letter from an inmate, the procedure is to document the following items in a mail log:1) if mail is incoming or outgoing; 2) the category of the mail (general, legal, special, media); 3) the certified number; 4) the sender/inmate's name and TDCJ number; 5) date received in the mailroom; 6) date delivered 7) inmate's signature; and 8) the officer's/ employee's signature.

Case 2:00-cv-00099   Document 13   Filed in TXSD on 09/21/2000   Page 82 of 83

After the above information is placed in the mailroom log, the certified letter is carried to the U. S. Post Office in Beeville. The letter is taken to the Post Office the same day that its information is placed in the mailroom log.

The receipt for certified mail is stamped by the U. S. Postal Service when the Texas Department of Criminal Justice releases the letter to the U. S. Postal Clerk. The U. S. Postal employee, not a TDCJ employee stamps the certified mail receipts. The U. S. Post Office will not stamp the receipt for certified mail unless it receives the corresponding letter with the green card attached. After the Texas Department of Criminal Justice releases the letters to the custody of the U. S. Post Office, it has no control over the inmate's mail. The stamped receipt for certified mail is later returned to the inmate.

In witness whereof, I have hereto set my hand on this 20th day of September, 2000."

_Lillie Harris_

Lillie Harris
Mailroom Supervisor
Garza West Unit
HCO2 Box 995
Beeville, Texas 78102

SWORN TO AND SUBSCRIBED BEFORE ME, by the said Lillie Harris

on this the 20th day of September, 2000, to certify which witness my hand and seal of office.



_Tiffany M Parker_
NOTARY PUBLIC in and for the
State of Texas

Tiffany M. Parker
Printed name of Notary

My Commission Expires: 4-27-04

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| *DENNIS R. WALKER,*<br>**Plaintiff,** | §<br>§<br>§ | |
| **v.** | §<br>§ | **Civil Action No. CA-C-00-099** |
| *SUSAN LAMB, ET AL.,*<br>**Defendants.** | §<br>§<br>§ | |

## ORDER

Be it remembered that on this day came on to be heard Defendant Lamb's Motion for Summary Judgment. The Court, after considering the pleadings of the parties filed herein, is of the opinion that the following order should issue:

It is hereby **ORDERED** that Defendant Lamb's Motion for Summary Judgment is of merit and is **GRANTED**;

It is further **ORDERED** that all claims against Susan Lamb in the above-numbered and styled cause of action be, and is hereby, **DISMISSED WITH PREJUDICE**.

This is a final judgement and disposes of all the parties and all the issues in this suit. All relief not specifically granted herein is hereby **DENIED**.

**SIGNED** on this _____ day of _____, 2000.

_____
**JUDGE PRESIDING**